**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AMBASE CORPORATION; 111 WEST 57th
MANAGER FUNDING LLC; and 111 WEST 57th
INVESTMENT LLC,

                       Plaintiffs,

v.

CUSTOM HOUSE RISK ADVISORS, INC.; and
ELIZABETH LOWE.

                       Defendants.

Civil Action No. 1:20-cv-2763

---

## <u>COMPLAINT</u>

Plaintiffs AmBase Corporation ("AmBase"), 111 West 57th Manager Funding LLC ("Manager Funding"), and 111 West 57th Investment LLC ("Investment," and together with AmBase and Manager Funding, "Plaintiffs"), by and through the undersigned attorneys, file this Complaint against Custom House Risk Advisors, Inc. ("Custom House") and Elizabeth Lowe ("Lowe," and together with Custom House, "Defendants"), for aiding and abetting breaches of fiduciary duties by non-parties 111 West 57th Control LLC ("Control"), 111 West 57th Sponsor LLC ("Sponsor"), Michael Stern ("Stern"), and Kevin Maloney ("Maloney," and together with Control, Sponsor, and Stern, "the Developers") and for fraud. Plaintiffs seek damages and equitable relief, including a disgorgement of profits Defendants earned while facilitating the Developers' breaches and committing fraud. In support of their Complaint against Defendants, Plaintiffs hereby allege as follows:

## NATURE OF THE ACTION

1.      This case involves the theft of millions of dollars through a complex insurance fraud. The insurance policy at issue relates to the development of a luxury condominium project. The crux of the fraud was to pay in a large sum of money (over $16 million) for an insurance policy that would pay out the bulk of that money back to the owner of the policy if losses did not exceed the pre-funded loss account. The joint venture established to develop the building paid for the policy. But unbeknownst to Plaintiffs, one of the Developers, not the joint venture, was designated to receive this refund. And it was all orchestrated by Defendant Elizabeth Lowe.

2.      Plaintiffs are majority investors in a project to develop a luxury, high-rise condominium property at 105-111 West 57th Street (the "Project"). Under the documents governing the Project, Developers manage its day-to-day operations.

3.      Michael Stern and Kevin Maloney, the individual Developers, are involved in other real estate projects in addition to the Project. They conduct their activities in part through JDS Development LLC and Property Markets Group, Inc. ("PMG"), general development and construction management companies that they respectively control. Plaintiff Investment and Sponsor, an LLC controlled by Stern and Maloney, joined together to form 111 West 57th Partners LLC ("the Company") to govern development of the Project.

4.      After the formation of the Company, Stern acquired insurance coverage for the Project from Liberty Mutual. Defendant Lowe acted as his agent in negotiating and acquiring the policy, and she worked with him to develop a structure that would benefit his interests to the detriment of the Project.

5.      The structure of the policy is manifestly contrary to the Project's interests. In particular, Stern and Lowe negotiated the policy to include a large pre-funded loss fund totaling

$16.5 million. Under the terms of the policy, the Company was forced to fund the loss fund upfront, putting undue financial strain on the Project. Indeed, when the insurance costs quickly and foreseeably contributed to the Project's being short of capital, a lender foreclosed on the Project, causing Plaintiffs to purportedly lose their investment. Stern and Lowe's activity thus caused an immediate and severe harm to Plaintiffs and the Project.

6.      Only well after Stern agreed to the policy on behalf of the Company did it come to light why he and Lowe structured it the way they had. The loss fund was an available pool of money from which to pay the deductibles of claims as they arose, with the excess to be refunded upon completion of the Project. Given that the policy was acquired with Company funds for the purpose of insuring the Project, the excess should have been refunded to the Company. Instead, Stern and Lowe negotiated the policy to have the beneficiary of excess loss fund amounts be ***JDS Construction***, Stern's personal development and general construction vehicle. That means that under the terms of the policy—which on information and belief remain in place to this day—Stern, not the Company or the Project, controls and benefits from the loss fund. Stern therefore can use the funds to benefit his other construction projects, either by taking the refund in cash or rolling it over into either insurance policies that will benefit his other projects. This is a gross violation of Stern's fiduciary duties to Plaintiffs.

7.      Lowe was instrumental in enabling Stern to structure the policy to benefit himself personally. Among other things, Lowe falsely represented to Liberty Mutual that JDS Construction would be managing construction on the Project, negotiated coverage with the largest possible loss fund, falsely told Plaintiffs' representative that the loss fund would come back to the Project and withheld copies of the policy from Plaintiffs, and worked to ensure that JDS Construction would remain the beneficiary of the loss fund even after Stern's perfidy came to light.

8.      Lowe's acts of fraud and aiding and abetting Developers' fiduciary breaches have severely harmed Plaintiffs. Plaintiffs, for example, relied on Lowe's fraudulent misrepresentations and omissions in deciding to contribute to a subsequent capital call and to authorize the use of Company funds for payments on the Policy, including payments into the loss fund.

9.      Plaintiffs therefore bring this action against Lowe and her employer, Custom House, for damages and disgorgement of the payments they received to facilitate Developers' fraudulent scheme.

## JURISDICTION AND VENUE

10.      This Court has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332.

11.      This Court has personal jurisdiction over Defendants under N.Y. C.P.L.R. §§ 301 and 302.

12.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

## PARTIES

13.      Plaintiff AmBase Corporation is a corporation incorporated in the state of Delaware, having its principal place of business in New Jersey.

14.      Plaintiff 111 West 57th Manager Funding LLC is a limited liability company organized under the laws of Delaware. Its members are (1) AmBase, and (2) non-party Masood Bhatti, an individual who, upon information and belief, resides in and is a citizen of the state of Connecticut.

15.      Plaintiff 111 West 57th Investment LLC is a limited liability company organized under the laws of the state of Delaware. Its members are (1) AmBase, (2) non-party Richard A. Bianco, an individual who is a citizen of the state of Florida, and (3) non-party 111 West 57th

Capital LLC, a limited liability company whose sole member is Richard A. Bianco. Both Investment and Manager Funding are single-purpose entities formed to play a role in the Project, and their officials have often met in New York to make high-level corporate decisions.

16.     Defendant Custom House Risk Advisors, Inc., is a corporation incorporated and maintaining its principal place of business in the state of Massachusetts. Custom House's principal office is located at One University Drive, Suite 188, Westwood, Massachusetts 02090.

17.     Upon information and belief, Defendant Elizabeth Lowe resides in Walpole, Massachusetts, is a citizen of the state of Massachusetts, and serves as the President and Risk Management Executive of Custom House. Prior to joining Custom House, Lowe was employed by non-party Robert M. Currey & Associates, Inc. ("RMC"). She is licensed as an insurance advisor in New York and Massachusetts.

## FACTUAL ALLEGATIONS

### Formation of the Joint Venture

18.     In June 2013, Stern and Maloney induced AmBase to enter into a joint venture (the "Joint Venture") with them to acquire and develop property at 105–111 West 57th Street, New York, New York 10019 (the "Property"), into a luxury residential tower with retail space (the "Project").

19.     To facilitate the Joint Venture, the parties entered into a series of limited liability company agreements.

20.     Most relevant here, Investment joined with Sponsor to form the Company. Investment's and Sponsor's rights and obligations with respect to the Company were governed by a limited liability company agreement dated June 28, 2013 (as amended and restated on December 17, 2013, "the Joint Venture Agreement," attached hereto as **Exhibit A**).

21.     Manager Funding had a small indirect stake in Sponsor, but Sponsor was controlled by Control, a limited liability company owned and controlled by Stern and Maloney. The relationship between Manager Funding and Control is governed by a limited liability company agreement dated June 28, 2013 (the "Manager LLC Agreement").

22.     Investment initially contributed $56 million in cash to the Joint Venture in exchange for a 59% interest in the Company. Sponsor purportedly contributed $39 million in property interests and cash (of which $1.5 million came from Manager Funding) to the Joint Venture in exchange for a 41% interest in the Company. (Collectively, these contributions are referred to herein as the "Initial Capital Contribution(s)"). In December 2013, a non-party investor joined the Company.

23.     Simultaneously with the formation of the Joint Venture, the Company entered into a development agreement (the "Development Agreement") with 111 West 57th Developer LLC, a wholly owned subsidiary of Control, "to manage and supervise the completion of the Project."

24.     Also on or about June 28, 2013, the Company obtained a $230 million acquisition loan from Annaly CRE LLC (the "Acquisition Loan"). The loan, which was leveraged by the Initial Capital Contributions, was intended to cover property acquisition costs and pre-development expenses and to provide funding for the Company until Sponsor could obtain construction financing (the "Construction Loan"). The Acquisition Loan was for a term of one year, with an option to extend for two six-month periods upon payment of additional interest and fees.

25.     The Joint Venture Agreement contemplates that most expenses associated with the Project will be covered by debt financing (primarily the "Construction Loan").

26.     The Agreement also permits the Company to request additional capital from its members through Additional Capital Contributions.

27.     Under the Joint Venture Agreement, Sponsor serves as the Manager of the Company, which means that it exercises "day-to-day authority to act for the Company." Joint Venture Agreement § 7.2. Sponsor also enjoyed the power to call for Additional Capital Contributions "in accordance with the Budget," or "on account of any Company Overrun." *Id.* § 3.2(a)(i).

28.     In addition to their work on the Project, Stern and Maloney develop and manage a variety of other construction projects. Both operate through a variety of project-specific LLCs, as well as their personal construction management and development companies.

29.     Non-parties JDS Development LLC ("JDS Development") and JDS Construction Group LLC ("JDS Construction," and together with JDS Development, "JDS") are general construction management and development companies affiliated with and controlled by Stern.

30.     Non-party Property Markets Group, Inc. ("PMG") is a general development company affiliated with and controlled by Maloney.

**<u>Procurement of Insurance Policy</u>**

31.     One of the Developers' responsibilities was to procure insurance coverage for the Project.

32.     In 2014, Lowe, as Stern's agent, negotiated and procured the primary insurance coverage for the Project with Liberty Mutual using a non-traditional product that required significant upfront cash payments. This insurance structure was in essence the most expensive policy structure available in terms of required upfront cash payments.

33.     This insurance product required that the Company pay over $16 million into an insurance collateral fund, controlled solely by Stern. Stern and Lowe worked together to bind the insurance in the name of JDS Construction as the sole beneficiary of the insurance collateral fund, rather than in the name of the Company. Lowe accomplished this task by falsely representing that JDS Construction would be managing construction on the project.

34.     But at the time, JDS Construction had no ownership stake in the project, no contractual relationship with the Joint Venture, and no authority to enter into contracts on behalf of the Company or its subsidiaries. Upon information and belief, based upon her role and the actions alleged herein, Lowe was aware of these facts and acted to advance Stern's interests to the detriment of Plaintiffs and the Project.

35.     By means of Lowe's false representations, Stern obtained complete control of the administration of the policy. His control was so complete that no other members of the joint venture—not even Maloney, who supposedly jointly managed the project—could obtain copies of the policies to review their terms or the scope of their coverage.

36.     Stern used this authority to negotiate deals that were advantageous to his real estate development and construction management business, at the expense of the Joint Venture and Plaintiffs.

37.     The most lucrative advantage, however, may have been the insurance policy itself: a key feature of the insurance coverage JDS Construction purchased with the Company's funds is a pre-funded deductible program ("Loss Fund"). The program provided for the insured to make quarterly upfront payments to Liberty Mutual totaling $16.5 million into the Loss Fund to be applied to any claim filed. Any money remaining in the Loss Fund after all claims were settled

would be returned to the party designated in the policy: in this case, JDS Construction. Lowe and Stern decided to negotiate coverage with the largest possible Loss Fund.

38.     Because this arrangement required large upfront payments and provided for the return of funds only at the end of the coverage, this insurance structure created significant cash flow problems for the Joint Venture and ultimately contributed to an alleged default on the junior mezzanine loan by exacerbating the Joint Venture's inability to complete the project on budget. The structure of the policy was therefore immediately harmful to the Project. But the huge loss fund offered a substantial advantage to Stern: by naming JDS Construction as the beneficiary, Stern would be able to use payments from the loss fund for the benefit of any of the projects in which JDS Construction was involved and would be able to take for himself any balance that remained at the end of the project.

39.     In other words, with Lowe's assistance, Stern used the insurance policies to siphon up to $16.5 million of the Company's money into his own company's pockets.

40.     Lowe bound the policies in August 2014, while she was employed by Custom House and acting within the scope of her authority. Upon information and belief, Custom House retained the benefits of her actions in the form of fees and other compensation paid by the Company and JDS Construction. Custom House and Lowe also stood to benefit if Custom House were appointed administrator of the policy and paid fees accordingly. Lowe reasonably could have expected that this was more likely to happen with the policy bound in the name of JDS Construction and under Stern's control.

**Cover Up**

41.     Lowe knew this policy structure benefitted Stern and JDS Construction to Plaintiffs' detriment, and Lowe assisted Stern and his agents in hiding the scheme from Plaintiffs through a series of fraudulent statements and omissions.

42.     At the time the insurance policies were negotiated, JDS and PMG were both represented by the same risk management company, Robert M. Currey & Associates ("RMC"), of which Lowe was an employee.

43.     Shortly before the conclusion of negotiations over the insurance policy, however, Lowe left RMC and began to work for Custom House, keeping JDS Construction as her client. Acting on behalf of Stern and JDS Construction, Lowe bound the policies without notifying RMC or PMG.

44.     At all relevant times thereafter, Lowe was employed by Custom House.

45.     Although the Project's operative budget at the time called for only approximately $11 million in expenditures for insurance, in line with industry practice, a cash flow forecast and projected capital call schedule that JDS provided to Plaintiff around November 2014 showed the Joint Venture spending over $24 million on insurance over just two years.

46.     In a November 25, 2014, email to JDS, AmBase VP John Ferrara, acting on behalf of all Plaintiffs, inquired about this discrepancy. That afternoon, JDS responded by email, explaining that "[w]e are required to pay into a loss fund (Cash collateral) as part of each quarterly payment for a total loss fund of $16.5M. Please note that if there are no claims, we would get this entire value back as it essentially functions as a deductible reserve. Our total non refundable insurance premium payments are about $7.6M which is considerably lower than what was initially projected." JDS downplayed potential cashflow problems by explaining that money could be

reallocated from the trade line items to the insurance line item when the project received "deducts from trades that will not need to carry their own full insurance policies on this project." JDS offered to put Ferrara in contact with Lowe at Custom House.

47.     Upon information and belief, based upon her role and the actions alleged herein, Lowe knew that Ferrara was a representative of Plaintiffs, business partners to whom Stern owed fiduciary duties.

48.     On or around December 3, 2014, John Ferrara spoke by phone with Lowe. Lowe explained the structure of the insurance policy and claimed that it provided benefits to the Joint Venture. In particular, she represented that money left over in the Loss Fund "comes back to the project," even though she knew that it would be returned to JDS Construction.

49.     Lowe represented that the structure of the policy was the most advantageous for the Joint Venture, even though she knew that the most appropriate alternative structure was a fixed-premium insurance policy owned by the Company. Moreover, Lowe with JDS structured a program with a large Loss Fund, resulting in higher overall program end payout to Stern, with the highest potential benefit to Stern's other projects and an overall higher exposure for the Project. The Company would exercise no control over the massive Loss Fund, as JDS Construction retained the ability to abscond with the proceeds of the Loss Fund, over which it exercised and continues to exercise exclusive and unchecked control.

50.     Although Ferrara requested copies of the policies, Lowe did not provide them. Nor did she disclose that JDS Construction was the named beneficiary of the $16.5 million Loss Fund.

51.     In reliance on these fraudulent misrepresentations and omissions, Plaintiffs contributed capital for or authorized the use of Company funds for additional payments on the policy, including additional payments into the Loss Fund. To take one example, Investment, with

funding from AmBase, contributed an additional $6.2 million to the Joint Venture in response to an April 2015 capital call; $2.8 million of this amount was for insurance. Had Plaintiffs known that JDS, and not the Joint Venture, was the beneficiary of the Loss Fund, they would not have made this capital contribution.

52.     Lowe and Stern made similar false representations and omissions to Maloney and his agents, but once Maloney discovered the scheme, he sought to benefit from it himself to the detriment of Plaintiffs and the Company.

53.     For example, in a December 15, 2014, email to RMC (which was then acting as PMG's and Maloney's agent), Lowe falsely represented that the Loss Fund was for the benefit of the "ownership structure" and that the partnership controlled how its proceeds were handled.

54.     In early 2015, however, Maloney discovered Stern's deception. Instead of immediately notifying Plaintiffs and working to place the policies in the Company's name, Maloney demanded that they be placed in the name of 111 West 57th Developer LLC, an entity jointly controlled by Stern and Maloney by way of Control. In other words, Maloney still sought to use the Company's money to purchase a policy that would benefit the Developers alone, at Plaintiffs' expense.

55.     Lowe communicated with the insurance broker for the policies to ensure that it took no steps to change the name of the first insured under the policy. Lowe also tried to persuade Liberty Mutual to represent that it would be unwilling to change the name on the insurance policy.

56.     As Lowe knew, these delays locked the Joint Venture into an insurance policy controlled by JDS Construction. By March 2015, prices for the insurance coverage the Project required had skyrocketed.

57.     Once the Joint Venture was locked in, and in response to pressure from Maloney, Stern made a show of attempting to change the name on the policy.

58.     In a letter dated August 12, 2015, Stern, acting on behalf of JDS Construction, sent a letter to the broker directing it to request that Liberty Mutual change the First Named Insured on the insurance policies from JDS Construction to 111 Construction Manager LLC ("Construction Manager")—a newly-formed entity owned and controlled exclusively by Stern and Maloney.

59.     On August 17, 2015, an employee of Willis of New York, the insurance broker, sent an email to an employee of Liberty Mutual requesting the change. After a phone call with Willis, Liberty Mutual declined to make the change on the ground that it had underwritten the program based on Lowe's false representation that JDS Construction, rather than a partnership entity, was responsible for making payments and managing construction.

60.     Upon information and belief, Stern made this request only because Lowe had already ensured that Liberty Mutual would not grant it and that he would remain in control of the policy.

61.     Thereafter, Plaintiffs learned that Defendants had named JDS Construction instead of the Company as the beneficiary on the Loss Fund. By then, as Defendants and the Developers already knew, changing the ownership of the policies would be incredibly costly, if possible at all.

62.     In response to Plaintiffs' demands, in late October 2015, Stern sent a letter to members of the Joint Venture claiming JDS Construction directed Liberty Mutual to return any proceeds of the Loss Fund to the Company.

63.     Despite repeated requests, Stern failed to provide documentation for the purported change.

64.     To this day, upon information and belief, there is no binding order transferring the policy or proceeds of the loss fund to the Company. Indeed, Stern, Maloney, and Sponsor have taken the position that the Company is dissolved as a matter of law.

### Foreclosure

65.     In the meantime, in June 2015, Stern and Maloney closed on the Construction Loan for the project.

66.     AmBase and Investment once again relied on representations by Defendants and the Developers when it approved a new budget in connection with the Construction Loan and when it approved the debt financing that would be used to cover the insurance costs reflected in that budget.

67.     Had AmBase and Investment known that the $16.5 million was going to be diverted to JDS Construction, it would not have approved the new budget and debt financing.

68.     The budget the Developers provided to the Lenders understated insurance costs by many millions of dollars, evidently by omitting some percentage of the money scheduled to be deposited in the Loss Fund on the theory that the money would be refunded. Because the Company was required to pay these costs up front, however, the consequence of the Developers' misrepresentation was that the Project was soon "out of balance" under the terms of the loans.

69.     Eventually, a junior lender declared an event of default and, on August 30, 2017, purported to foreclose upon the collateral securing its loan.

70.     Although Investment is challenging the propriety of that foreclosure on its own behalf and on the behalf of the Company, if it is upheld, the Company—and therefore Plaintiffs—will have lost its indirect interest in the Property and the Project.

71.     Plaintiffs continued, however, to own their interests in the Company, which in turn should own an interest in the proceeds of the Loss Fund.

72.     In or around September 2018, however, the Company's accountants—at the direction of the Developers—provided Plaintiffs with IRS K-1 Schedules showing that the Company's property is worthless.

73.     It therefore appears that sometime after August 30, 2017, (1) Stern and Maloney continued to use the Loss Fund to collateralize a construction project in which the Company has no interest and (2) Stern secretly overrode his instruction to Liberty Mutual to refund money from the Loss Fund to the Company.

74.     Upon information and belief, based upon their role and the actions alleged herein, Defendants facilitated these transactions by coordinating the necessary changes with the broker and Liberty Mutual and knew that Stern and Maloney breached their fiduciary duties to Plaintiffs by engaging in this fraudulent scheme.

**FIRST CLAIM FOR RELIEF**
**Aiding and Abetting a Breach of Fiduciary Duty**
**(AmBase Corporation Against Lowe and Custom House)**

75.     Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

76.     As co-venturers, Stern and Maloney owed AmBase fiduciary duties, including the duties of loyalty and care.

77.     Stern and Maloney breached their fiduciary duties to AmBase by engaging in the wrongful and intentional misconduct set forth above.

78.     Their breaches involved fraud and a knowing and culpable violation of law because: they or their agents represented on multiple occasions that the proceeds of the Loss Fund

15

would be returned to the Company, when they knew that the proceeds of the Loss Fund would be paid to JDS Construction or some other entity, because they or their agents represented that the structure of the insurance policy was advantageous to the Joint Venture, when they knew it would create cash flow problems, and because they omitted to inform AmBase that the insurance policies and Loss Fund were in JDS Construction's name, when they were under a fiduciary obligation to disclose that fact. AmBase justifiably relied on these misrepresentations and omissions when it contributed money for Additional Capital Calls to pay premiums and money into the Loss Fund, when it (through Investment) approved the Joint Venture borrowing money, in part to cover insurance costs, and when it declined to exercise contractual rights (through Investment) that would have protected it from the loss that resulted in part from the Developers' insurance scheme. AmBase was injured by the misrepresentations and omissions by, inter alia, the loss of its capital contributions, the Company's loss of the $16.5 million paid into the Loss Fund and the loss of its interest in the Project, which resulted from budget overruns traceable in part to high insurance costs.

79.     Their breaches involved intentional misconduct because, among other things, Stern and Maloney knew that putting the insurance policy in JDS Construction's name was wrongful and highly likely to result in an injury to AmBase, and yet proceeded with their course of conduct.

80.     Their breaches constituted a transaction not authorized under the operative agreements from which they derived a personal benefit because the operative agreements did not authorize Stern and Maloney to maintain insurance paid for by the Company in JDS Construction's name, and they derived a personal benefit therefrom in the form of, inter alia, unilateral control over the contracting and permitting process (in Stern's case), and unchecked access to the proceeds of the Loss Fund.

81.     At all relevant times after August 2014, Lowe acted as an agent of Custom House.

82.     Upon information and belief, based upon their role and the facts alleged herein, Defendants had actual knowledge that Stern and Maloney owed fiduciary duties to AmBase.

83.     Defendants had actual knowledge of their breaches of those duties because Defendants helped coordinate and arrange such breaches.

84.     Lowe substantially assisted Stern and Maloney by engaging in the wrongful conduct set forth herein, including by negotiating coverage with a large Loss Fund, binding the coverage, misleading Plaintiffs about and concealing the structure and ownership of the coverage, persuading the broker and Liberty Mutual not to change the ownership of the coverage, securing Stern's unilateral control over the coverage, and facilitating Stern's and Maloney's continued use of the coverage in the wake of the foreclosure.

85.     At the time Lowe carried out these acts of assistance, she was employed by Custom House and acting within the scope of her authority.

86.     Upon information and belief, Custom House retained the benefits of her actions in the form of fees and other compensation paid by the Company and JDS Construction.

87.     Upon information and belief, Defendants profited from this insurance scheme.

88.     Misrepresentations by Defendants and the Developers have prevented AmBase from discovering the full scope of Stern's and Maloney's breaches and the extent of its injuries therefrom to this day.

89.     As a direct and proximate result of Defendants' aiding and abetting the breaches of fiduciary duty, AmBase has suffered damages in an amount to be determined at trial, exceeding $75,000.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting a Breach of Fiduciary Duty
**(Manager Funding Against Lowe and Custom House)**

90.     Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

91.     As co-venturers and principals of 111 West 57th Manager LLC, Stern and Maloney owed Manager Funding fiduciary duties, including the duties of loyalty and care.

92.     As a co-participant in the Joint Venture and manager of 111 West 57th Manager LLC, Control owed Manager Funding fiduciary duties, including the duties of loyalty and care.

93.     Although Section 7.6 of the Manager LLC Agreement purports to waive its members' fiduciary duties to each other in part, the waiver does not apply to acts or omissions that involve "fraud, intentional misconduct or a knowing and culpable violation of law" or for any transaction not authorized under the agreement from which a party derives personal benefit. Moreover, Section 7.6 expressly imposes a duty of care "to not commit fraud, intentional misconduct or a knowing and culpable violation of law."

94.     Control, Stern, and Maloney breached their fiduciary duties to Manager Funding by engaging in the wrongful and intentional misconduct set forth above.

95.     Their breaches involved fraud and a knowing and culpable violation of law because they or their agents represented on multiple occasions that the proceeds of the Loss Fund would be returned to the Company, when they knew that the proceeds of the Loss Fund would be paid to JDS Construction or some other entity, because they or their agents represented that the structure of the insurance policy was advantageous to the Joint Venture, when they knew it would create cash flow problems, and because they omitted to inform Manager Funding that the insurance policies and Loss Fund were in JDS Construction's name, when they were under a fiduciary

obligation to disclose that fact. Manager Funding justifiably relied on these misrepresentations and omissions when it contributed money for Additional Capital Calls to pay premiums and money into the Loss Fund. Manager Funding was injured by the misrepresentations and omissions by, inter alia, the loss of its capital contributions, the Company's loss of the $16.5 million paid into the Loss Fund and the loss of its interest in the Project, which resulted from budget overruns traceable in part to high insurance costs.

96.     Their breaches involved intentional misconduct because, among other things, Stern, Maloney, and Control knew that maintaining the insurance policy in the name of an entity other than the Company was wrongful and highly likely to result in an injury to Manager Funding, and yet proceeded with their course of conduct.

97.     Their breaches constituted a transaction not authorized under the Manager LLC Agreement from which they derived a personal benefit because the Manager LLC Agreement did not authorize Stern and Maloney to maintain insurance paid for by the Company in JDS Construction's name, and they derived a personal benefit therefrom in the form of, inter alia, unilateral control over the contracting and permitting process (in Stern's case), and unchecked access to the proceeds of the Loss Fund.

98.     At all relevant times after August 2014, Lowe acted as an agent of Custom House.

99.     Upon information and belief, based upon their role and the facts alleged herein, Defendants had actual knowledge that Control, Stern, and Maloney owed fiduciary duties to the Company.

100.    Defendants had actual knowledge of their breaches of those duties because Defendants helped coordinate and arrange such breaches.

101.    Lowe substantially assisted Control, Stern, and Maloney by engaging in the wrongful conduct set forth herein, including by negotiating coverage with a large Loss Fund, binding the coverage, misleading Plaintiffs about and concealing the structure and ownership of the coverage, persuading the broker and Liberty Mutual not to change the ownership of the coverage, securing Stern's unilateral control over the coverage, and facilitating Stern's and Maloney's continued use of the coverage in the wake of the foreclosure.

102.    At the time Lowe carried out these acts of assistance, she was employed by Custom House and acting within the scope of her authority.

103.    Upon information and belief, Custom House retained the benefits of her actions in the form of fees and other compensation paid by the Company and JDS Construction.

104.    Upon information and belief, Defendants profited from this insurance scheme.

105.    Misrepresentations by Defendants and the Developers have prevented Manager Funding from discovering the full scope of Stern's and Maloney's breaches and the extent of its injuries therefrom to this day.

106.    As a direct and proximate result of Defendants' aiding and abetting the breaches of fiduciary duty, Manager Funding has suffered damages in an amount to be determined at trial, exceeding $75,000.

**THIRD CLAIM FOR RELIEF**
<u>**Aiding and Abetting a Breach of Fiduciary Duty**</u>
**(Investment Against Lowe and Custom House)**

107.    Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

108.    As co-venturers and Principals of the Company, Stern and Maloney owed Investment fiduciary duties, including the duties of loyalty and care.

109.    As a co-participant in the Joint Venture and manager of the Company, Sponsor owed Investment fiduciary duties, including the duties of loyalty and care.

110.    Although Section 8.5 of the Joint Venture Agreement purports to waive its members' fiduciary duties to each other in part, the waiver does not apply to acts or omissions that involve "fraud, intentional misconduct or a knowing and culpable violation of law" or for any transaction not authorized under the Joint Venture Agreement from which a party derives personal benefit. Moreover, Section 8.5 expressly imposes a duty of care "to not commit fraud, intentional misconduct or a knowing and culpable violation of law."

111.    Sponsor, Stern, and Maloney breached their fiduciary duties to Investment by engaging in the wrongful and intentional misconduct set forth above.

112.    Their breaches involved fraud and a knowing and culpable violation of law because they or their agents represented on multiple occasions that the proceeds of the Loss Fund would be returned to the Company, when they knew that the proceeds of the Loss Fund would be paid to JDS Construction or some other entity, because they or their agents represented that the structure of the insurance policy was advantageous to the Joint Venture, when they knew it would create cash flow problems, and because they omitted to inform Investment that the insurance policies and Loss Fund were in JDS Construction's name, when they were under a fiduciary obligation to disclose that fact. Investment justifiably relied on these misrepresentations and omissions when it contributed money for Additional Capital Calls to pay premiums and money into the Loss Fund, and when it approved the Joint Venture borrowing money, in part to cover insurance costs. Investment was injured by the misrepresentations and omissions by, inter alia, the loss of its capital contributions, the Company's loss of the $16.5 million paid into the Loss Fund, and the loss of its

interest in the Project, which resulted from budget overruns traceable in part to high insurance costs.

113.    Their breaches involved intentional misconduct because, among other things, Stern, Maloney, and Sponsor knew that putting the insurance policy in JDS Construction's name was wrongful and highly likely to result in an injury to Investment, and yet proceeded with their course of conduct.

114.    Their breaches constituted a transaction not authorized under the Joint Venture Agreement from which they derived a personal benefit because the Joint Venture Agreement did not authorize Stern and Maloney to maintain insurance paid for by the Company in JDS Construction's name, and they derived a personal benefit therefrom in the form of, inter alia, unilateral control over the contracting and permitting process (in Stern's case), and unchecked access to the proceeds of the Loss Fund.

115.    At all relevant times after August 2014, Lowe acted as an agent of Custom House.

116.    Upon information and belief, based upon their role and the facts alleged herein, Defendants had actual knowledge that Sponsor, Stern, and Maloney owed fiduciary duties to Investment.

117.    Defendants had actual knowledge of their breaches of those duties because Defendants helped coordinate and arrange such breaches.

118.    Lowe substantially assisted Sponsor, Stern, and Maloney by engaging in the wrongful conduct set forth herein, including by negotiating coverage with a large Loss Fund, binding the coverage, misleading Plaintiffs about and concealing the structure and ownership of the coverage, persuading the broker and Liberty Mutual not to change the ownership of the

coverage, securing Stern's unilateral control over the coverage, and facilitating Stern's and Maloney's continued use of the coverage in the wake of the foreclosure.

119.   At the time Lowe carried out these acts of assistance, she was employed by Custom House and acting within the scope of her authority.

120.   Upon information and belief, Custom House retained the benefits of her actions in the form of fees and other compensation paid by the Company and JDS Construction.

121.   Upon information and belief, Defendants profited from this insurance scheme.

122.   Misrepresentations by Defendants and the Developers have prevented Investment from discovering the full scope of Stern's and Maloney's breaches and the extent of their injuries therefrom to this day.

123.   As a direct and proximate result of Defendants' aiding and abetting the breaches of fiduciary duty, Investment has suffered damages in an amount to be determined at trial, exceeding $75,000.

**FOURTH CLAIM FOR RELIEF**
**<u>Fraud</u>**
**(Plaintiffs Against Lowe and Custom House)**

124.   Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

125.    In December 2014, Lowe represented to an agent for Plaintiffs that money left over in the Loss Fund "comes back to the project," and that the structure of the insurance policy was advantageous for the Joint Venture.

126.   Those representations were false because the insurance policies and Loss Fund were in JDS Construction's name and under JDS Construction's control, and the high cost of the

policy would create cash flow problems that would cause the Joint Venture to run overbudget and allegedly default on its loans.

127.    Lowe knew the statements to be false when she made them because she had carried out the transactions that resulted in the insurance policies being bound and the Loss Fund being placed in JDS Construction's name, and she had priced out alternative insurance policy structures that would have decreased the Joint Venture's loss exposure and cash flow problems.

128.    Plaintiffs believed the statements to be true and justifiably relied upon them, and were thereby induced to contribute additional capital to cover insurance costs and approve additional borrowing by the Joint Venture to cover insurance costs.

129.    At the time Lowe made her misrepresentations, she was employed by Custom House and acting within the scope of her authority.

130.    Upon information and belief, Custom House retained the benefits of her actions in the form of fees and other compensation paid by the Company and JDS Construction.

131.    Upon information and belief, Defendants profited from this insurance scheme.

132.    As a direct and proximate result of Defendants' fraud, Plaintiffs suffered damages in an amount to be determined at trial, exceeding $75,000.

## DEMAND FOR JURY TRIAL

133.    Plaintiffs demand trial by jury on all claims and issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendant as follows:

(i)     Granting Plaintiffs damages in an amount to be proven at trial;

(ii)    Disgorging profits earned by Defendants from the wrongful conduct alleged herein;

(iii)     Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action;

(iv)     Granting Plaintiffs such other and further relief as the Court may deem just and proper.

Date:   April 2, 2020                                        Respectfully submitted,

David H. Thompson*                                   /s/ Stephen B. Meister
Peter A. Patterson*                                   Stephen B. Meister
Shelby L. Baird*                                      Kevin A. Fritz
1523 New Hampshire Avenue, N.W.                      Eugene Meyers
Washington, D.C. 20036                               MEISTER SEELIG & FEIN LLP
COOPER & KIRK, PLLC                                  125 Park Avenue, 7th Floor
Phone: (202) 220-9600                                New York, New York 10017
dthompson@cooperkirk.com                             Phone: (212) 655-3500
                                                     sbm@msf-law.com

*Attorneys for Plaintiffs*                            *Attorneys for Plaintiffs*


*Motion to proceed *pro hac vice* forthcoming.